# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>BRIAN COX,<br><br>               Petitioner. | No. 79664-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: September 3, 2019 |

APPELWICK, C.J. — In 2014, a jury found Cox guilty of two counts of criminal solicitation of first degree murder and one count of violating a protection order. This court affirmed the convictions in 2016. In this personal restraint petition, Cox argues that the State violated his rights to due process and a fair trial by presenting perjured testimony and withholding material impeachment evidence. We remand to the trial court for a reference hearing.

## FACTS

In April 2013, Brian Cox told his coworker, Ray Lopez-Ortiz, about his dissolution of marriage with his wife, Lisa Cox. State v. Cox, No. 45971-0-II, slip. op. at 3-4 (Wash. Ct. App. Nov. 8, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2045971-0-II%20Unpublished%20Opinion.pdf. Cox offered Lopez-Ortiz half of the life insurance policy on Lisa[1] to make her "'permanently disappear.'" Id. Later, while the police recorded, Lopez-Ortiz called Cox to confirm

_____

[1] For clarity, we refer to Lisa Cox by her first name.

that Cox was serious about having Lisa killed. Id. at 4. The two then arranged a meeting. Id.

On the day of the meeting, the police hid audio and video recorders on Lopez-Ortiz. Id. They listened as Cox told Lopez-Ortiz that he was "'totally serious'" and said, "'I still want that b**** dead, and [i]t's still worth 10 Grand to me.'" Id. Within an hour of the meeting, the police arrested Cox for soliciting Lisa's murder. Id.

Cox was cellmates with Kenneth Parmley for about a month of his pretrial incarceration. Id. Parmley testified that Cox thought the only way to avoid a conviction for soliciting Lisa's murder "would be for Lopez-Ortiz to 'disappear.'" Id. at 7. Cox asked for Parmley's assistance, and Parmley told him he had a friend who would kill Lopez-Ortiz and dispose of his body on a pig farm. Id.

Parmley, who had been charged with first degree robbery, initially hoped to make a deal with the State, and told police about his conversations with Cox. Id. He testified that he later decided to offer police a statement regardless of a deal:

> Q. Why the change?
>
> A. Well, I talked to my attorney, he had talked to the prosecutor, tried to get a deal for me and they weren't going to do anything. But I talked -- a little bit of time I thought about it and I just told my attorney that I felt like I needed to do it anyway.
>
> Q. What changed your mind?
>
> A. It may sound kind of corny, and I started reading the Bible and stuff and I just wanted to do the right thing, and I was actually concerned if he got the wrong person, got ahold of the wrong person, that some of this stuff might actually happen.

Parmley testified that he did not ask for anything regarding his case.

The State charged Cox with criminal solicitation of Lisa's murder, criminal solicitation of Lopez-Ortiz's murder, and violation of a protection order.[2] Cox, No. 45971-0-II, slip. op. at 2, 4. At Cox's February 2014 trial, Parmley testified about his conversations with Cox regarding Lopez-Ortiz. Before asking about those conversations, the State confirmed that Parmley had previously been convicted of the following crimes: second degree robbery in 2013, third degree possession of stolen property in 2005, third degree theft in 2004, possession of stolen property in 2004, and trafficking in stolen property in 2004.

Cox disputed Parmley's testimony, and stated that Parmley volunteered to help him in exchange for Cox paying his bail. Id. at 7. He testified that he never offered or agreed to pay Parmley any money. Id. Sonny Borja, another inmate housed with Cox and Parmley, testified that Parmley told him Cox was going to be his "'golden ticket out of [jail].'"

Mark Thompson, the Thurston County prosecutor who handled Parmley's case, also testified at Cox's trial. Thompson stated that, in 2013, corrections staff advised him that Parmley had sent a "kite," a note from the jail, asking them to contact a prosecutor or police because he had information relating to Cox. The note did not make any reference to requesting a deal or consideration in exchange

---

[2] Lisa obtained a protection order against Cox in March 2013. Cox, No. 45971-0-II, slip op. at 3. A few days after obtaining the order, Lisa reported to police that Cox had violated the order by tailgating her, honking, and extending his middle finger toward her. Id. at 4.

3

for information. He also stated that Parmley's attorney, Karl Hack, did not request a deal or consideration for Parmley.

Thompson testified further that Parmley's robbery case was resolved before Cox's trial, and that he was not given any consideration in exchange for the information he provided to law enforcement or his anticipated testimony. Parmley's robbery charge had been reduced, and he pleaded guilty to second degree robbery. Thompson explained,

> Parmley was allowed to plead guilty to the reduced charge based upon some evidence concerns. Some -- or the primary victim, complaining witness, had a prior criminal history that would come to a trier of fact's attention, and so there were considerations based upon the case facts itself, and we also did so to allow Mr. Parmley to avail himself of a -- of a dispositional option that he wouldn't have had on the first-degree which seemed to be appropriate based upon his time in the community that he had been successfully able to remain crime free.

A jury found Cox guilty as charged. Cox, No. 45971-0-II, slip. op. at 8. The trial court sentenced him to a total of 398.63 months of confinement. In 2016, this court affirmed Cox's convictions. Cox, No. 45971-0-II, slip. op. at 3.

In July 2017, Cox's counsel made a public disclosure request to the Tumwater Police Department for information relating to Cox's case. Among the records the department turned over was a July 29, 2013 e-mail from Thompson to Craig Juris, the Thurston County prosecutor who handled Cox's case. Thompson stated in the e-mail,

> My current offer on Parmley is not much: plead "as is" - Attempted Robbery 1, and recommend 27 months (low-end) of a 27-36 month sentence range. Despite the fact that my victim has impeachable priors, it's a strong case.

4

However, if you're needing Mr. Parmley's testimony against Brian Cox, you have my authority to offer plead [sic] to (a "full") Robbery 2 (not merely attempt) in exchange for his truthful testimony (which could be verified by polygraph, etc.) against Mr. Cox, which would include a full discussion of his proposed testimony. Please make it clear that Robbery 2 is still a strike offense. However this range would drop to 6 - 12 months. I'd be willing to give him 12 months [chemical dependency program (CDP)] or 10 months work release; I'm unsure if he's CDP eligible. You'll be "cc'ed" [in] an e-mail that I'm sending to CDP staff to inquire about this. Karl Hack is his attorney.

Cox also discovered that, at the time of Parmley's testimony, Parmley had five outstanding bench warrants. Neither the July 2013 e-mail nor the warrants were provided to Cox's counsel at trial. On December 19, 2017, Cox filed this personal restraint petition (PRP). Also, unknown to Cox when he filed his PRP were the e-mail exchanges between the prosecutors and Parmley's counsel, Hack, which predated Parmley's plea agreement, and which were disclosed in response to the PRP.

## DISCUSSION

Cox makes two arguments. First, he argues that the State violated his right to a fair trial by presenting false evidence. Second, he argues that the State violated his due process rights by failing to disclose material impeachment evidence. As a result, he asks this court to reverse his convictions for criminal solicitation of first degree murder and remand for a new trial. Alternatively, he asks this court to remand for a reference hearing.

A personal restraint petitioner must prove either (1) a constitutional error that results in actual and substantial prejudice, or (2) a nonconstitutional error that

5

constitutes a fundamental defect which inherently results in a complete miscarriage of justice. In re Pers. Restraint of Monschke, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). The burden is on the petitioner to prove the error by a preponderance of the evidence. Id.

The petitioner must support the petition with facts and the evidence available to support the factual allegations. In re Pers. Restraint of Rice, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). Bald assertions and conclusory statements are not sufficient to entitle the petitioner to a reference hearing. Id. at 886. If allegations are based on matters outside the record, the petitioner must demonstrate that competent, admissible evidence would establish the facts. Id. And, if the allegations are based on the knowledge of others, the petitioner must present their affidavits or other corroborative evidence. Id. If the petitioner makes this threshold showing, the court examines the State's response, which should identify any material disputed questions of fact. Id. If there are material disputed questions of fact, then the trial court will be directed to hold a reference hearing to resolve the factual questions. Id. at 886-87.

I.  Perjured Testimony

Cox argues that the State violated his right to a fair trial by presenting false evidence. Specifically, he asserts that, contrary to Parmley and Thompson's July 2013 testimony, Thompson had made an offer to reduce Parmley's robbery charge, Thompson had assessed the case against Parmley as strong, and Parmley got consideration in exchange for his testimony.

6

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (footnote omitted), abrogated on other grounds by United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). To succeed on a claim that the prosecutor presented false evidence, Cox must show that (1) the testimony was actually false, (2) the prosecutor knew or should have known that the testimony was actually false, and (3) the false testimony was material. See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

At Cox's trial, Thompson testified that Parmley was not given any consideration in exchange for the information he provided to law enforcement or for his anticipated testimony. He testified that the State offered Parmley the opportunity to plead guilty to second degree robbery so that he could avail himself of a CDP based on the amount of time Parmley had remained crime free. Cox argues that the e-mail from Thompson to Juris on July 29, 2013, which was disclosed under the postconviction public disclosure request, contradicts Thompson's testimony. He argues that it showed Thompson "had made an offer to reduce Parmley's charge" and "assessed the case against Parmley as strong." He also contends that Thompson "testified falsely that Parmley's pending charges were reduced because Parmley had [] been 'able to remain crime free.'" He argues that this is demonstrated by five outstanding warrants that were known to the State

and not disclosed before trial. Last, he asserts that Parmley said he testified without consideration because it was the right thing to do, "[b]ut clearly Parmley got consideration in exchange for his testimony."[3] He contends that the e-mail disclosed under the public disclosure request and the additional e-mails provided by the State in the appendices to its response to the PRP, demonstrate that Parmley received consideration in exchange for his testimony.[4]

<u>Chronological E-Mail Exchange</u>

July 29, 2013 (5:06 p.m.): Thompson to Hack:

> [By the way] – I'm sending an e-mail to Craig Juris that if he has any interest in using Parmley, he can contact you. I have given him case parameters for my case (potential robbery 2 reduction) if he has such an interest.
>
> I am also looking into CDP to see if it's even a possibility for a Robbery 2 dispo[sition], as a Rob[bery] 2 would result in a 6 - 12 month sentence range. Robbery 2nd degree is a "strike"/violent offense for which [electronic home monitoring] is not authorized per RCW 9.94A.734(1)(a). I'm asking CDP (L[ieutenant] Val Peters) whether it's possible for [a] person to do Phase I and II (only) of CDP and/or Phase III on continued work release.

---

[3] In Cox's reply brief, he argues that the State failed to disclose that Parmley asked "if the State could assist him getting out of that restrictive setting." In a 2018 declaration attached to the State's response, Juris stated that, in September 2013, Parmley sent him a letter "in which he complained that protective custody was preventing him from participating in the chemical dependency program and he threatened to not participate if something was not done to fix the situation." In another 2018 declaration attached to the State's response, Hack stated that, in the letter, "Parmley [informed] Juris that he would refuse to testify against Cox if something wasn't done about his situation in the jail." Juris stated that this letter was provided to Paul Strophy, Cox's counsel at trial. The trial record shows Strophy cross-examined Parmley on this issue.

[4] Nothing in the record suggests that the e-mails attached to the State's response were in the custody of the Department of Corrections, were within the scope of the public disclosure request, or were improperly withheld.

8

July 29, 2013 (5:09 p.m.): Thompson to Juris:

> UPDATE:
>
> Craig,
>
> My case is set for trial the week of 8/26 and I just continued my pretrial until 8/12/13 because I'm on vacation the end of this week and next week (back the 12th).
>
> My current offer on Parmley is not much: plead "as is" - Attempted Robbery 1, and recommend 27 months (low-end) of a 27-36 month sentence range. Despite the fact that my victim has impeachable priors, it's a strong case.
>
> However, if you're needing Mr. Parmley's testimony against Brian Cox, you have my authority to offer [to] plead to (a "full") Robbery 2 (not merely attempt) in exchange for his truthful testimony (which could be verified by polygraph, etc.) against Mr. Cox, which would include a full discussion of his proposed testimony. Please make it clear that Robbery 2 is still a strike offense. However his range would drop to 6 - 12 months. I'd be willing to give him 12 months CDP or 10 months [of] work release; I'm unsure if he's CDP eligible. You'll b[e] "cc'ed" [in] an e-mail that I'm sending to CDP staff to inquire about this. Karl Hack is his attorney.

July 29, 2013 (5:12 p.m.): Hack to Thompson:

> Thanks much! Like I said, Parmley is offering to help Craig for zero consideration. The other dude is plain dangerous.

July 30, 2013 (8:05 a.m.): Juris to Thompson:

> Thanks for the info. I just sent an e[-]mail to Jen Kolb asking her what she thinks of using Parmley for info[rmation]. As soon as I talk to her I will let you know where we stand. Also, I see an e[-]mail from Hack indicating that Parmley would be willing to help with no consideration. Somehow I don't believe that but you have a better sense of this guy than I do. What is your thought? No use selling the farm if we don't need to.

9

July 30, 2013 (8:07 a.m.): Juris to Thompson and Hack:

> Karl,
> Are you saying that Mr. Parmley doesn't want a deal in connection to my case? If that is the situation then I will have Detective Kolb interview him [as soon as possible]. If I am reading your e[-]mail incorrectly let me know and I will wait to have Kolb talk to him until you, me, and Mark get a plan in place. I just got back from vacation so I am playing catch up on all of this.

July 30, 2013 (9:41 a.m.): Hack to Juris:

> If he gets consideration in Mark's case for his cooperation in yours then all the better, but he's not asking for any promises in Mark's case. He thinks your guy needs to be off the street. Go ahead and have Det[ective] Kolb interview Mr. Parmley.

July 30, 2013 (9:57 a.m.): Juris to Thompson:

> I have been e[-]mailing with Detective Kolb and with Karl. Parmley is willing to be interviewed about Cox with nothing in return. We had talked about a more in depth investigation but that is being put on hold. Karl said he would be appreciative of any consideration you give him but made very clear in my e[-]mail that he is not expecting any. I am sending Jen in to interview him as soon as she has a chance.

July 30, 2013 (3:36 p.m.): Kolb to Juris and Thompson:

> I got a recorded statement from Parmley today. He was very cooperative and provided some good information. He said that if need be, he is will[ing] to [take a] poly[graph test] as well [as] attesting to the info[rmation] he provided. He is also will[ing] to wire up if needed.
>
> [For your information] Mark....he's really hoping for a good deal (I think he said low of 12 months or something), but even if he doesn't get what he wants, he knows this guy needs to be kept off the streets.

10

August 13, 2013 (12:34 p.m.): Thompson to Hack and Juris:

Karl,

I'm sending you this e-mail "as promised" following yesterday's Pretrial, and "cc'ing" it to Craig so that he is aware of our discussion.

First, we continued yesterday's [pretrial] one week to 8/19/13. Because our trial is set for the following week (8/26/13), you agreed that you would join me in a motion to continue the trial at least a few weeks (or longer) while we attempt to decide the "next step" in this case given that nothing had really happened during the past two weeks due to your vacation (week of 7/29) and my vacation (week of 8/5), including whether DPA [(deputy prosecuting attorney)] Craig Juris would likely use your client's testimony in his case against Brian Cox.

Secondly, I'll indicate that I am willing to give your client the "Robbery 2" based upon his lack of violent history and his request for drug treatment through CDP. But I want to get that entered sooner[ rather ]than[ ]later, in order to get him onto the waiting list for CDP [as soon as possible] so that he can have time to fully participate in at least Phases I and II. The plea to Robbery 2 would have to be via "in re Barr" as this was not a completed robbery and, therefore, the [probable cause] facts do not establish Robbery 2.

Finally, with respect to your client's involvement as a possible witness in DPA Craig Juris'[s] attempted murder case involving Brian Cox, you have represented to me that your client has already given a statement to law enforcement about conversations he had with Mr. Cox while [he was] Cox's cellmate, which involved Mr. Cox soliciting your client to possibly "tamper" (at the very least) with a witness in the Cox case. Your client provided his statement to Detective Kolb about this situation prior to any representations or promises by me about what I was going to do specifically with my case against him (Mr. Parmley). However, I believe that prior to Mr. Parmley's statement to Detective Kolb in the Cox case, I had at least sent a "cc" to you of e-mail inquiries I made to L[ieutenant] Peters about the jail's CDP program, which would only be possible if I were later agreeing to reduce the current Attempted Robbery 1 charge to Robbery 2. I'm uncertain whether you had shared my e-mails with your client prior to his statement to Det[ective] Kolb. In any event, you have indicated that your client is willing to truthfully testify against Mr. Cox should he be needed by Craig, and that such truthful testimony would be

11

consistent with his statement to Det[ective] Kolb and be provided without me needing to condition my case's outcome on your client's testimony. I am tentatively indicating to you that my offer of Robbery 2 will not be conditioned on your client's cooperation as a witness in the Cox case, **but I want to first ask Craig if he is "okay" with this?** If he is, it appears that we can immediately look into wrapping Mr. Parmley's case up. However, despite the information and "timing" noted above, I still believe that Craig would have to disclose to Cox's counsel at least the "arguable" influence of my case on Mr. Parmley's offered information against Mr. Cox. Therefore, I have spent time detailing the above so that Craig has this information to forward to Cox's counsel after you have either confirmed or clarified the information outlined above.

I'll send you specifics for the amended offer in a little bit.

Please confirm or clarify the information outline[d] in this e-mail.

August 13, 2013 (12:39 p.m.): Hack to Thompson:

Funny -- I think your below e-mail crossed inside the server with my e-mail to you about leaving Det[ective] Kolb a [voicemail] this morning. I've only told Parmley that you might let him take Robbery 2, but that you made no promises and that this possibility is not contingent on anything that Parmley may or may not do in the Cox case.

August 13, 2013 (2:43 p.m.): Thompson to Hack:

Karl,

My offer, dated July 29, 2013, is amended as follows:

- Plead guilty to an amended charge of Robbery 2nd Degree. This plea should be via in re Barr, as the original charge does not involve a completed Robbery 1.
- The State's original recommendation is amended only insofar as noted below:
  o 12 months jail - may be served in Jail's [CDP] if eligible and to extent eligible.
    ▪ As previously discussed via e-mails with L[ieutenant] Val Peters of the jail, "Phase III" normally involves EHM [(electronic home monitoring)]. However, RCW 9.94A.731(1)(a) prohibits EHM for a "violent" offense. The jail will

still take a Robbery 2 non-prison sentence and if the person reaches Phase III, they'll likely just remain on work release if otherwise eligible.

- o 12 months of community custody (due to non-prison sentence, which reduces the community custody from 18 months if a prison-sentence is involved).
- o No contact with the victim for 5 years.
- o (New) Forfeit interest in seized "weapon".

Otherwise, all other recommendations contained in my July 29, 2013 offer remain the same.

I have confirmed with DPA Craig Juris that he is fine with us proceeding with a [change of plea at sentencing] immediately. To hopefully obtain a [change of plea at sentencing] next week, **please let me know [as soon as possible] if I can seek to enter a [pretrial protection order] with your e-mail approval for next week.** Please just indicate what dates you are available. Again, I am trying to avoid next Friday if possible.

August 13, 2013 (2:58 p.m.): Thompson to Hack:

[For Your Information],

Per your client's info[rmation] that he knew the victim (Greg Hokanson) from their "old drug days", I did run criminal history on the victim, which I am disclosing to you per this e-mail.

Mr. Hokanson did have three convictions for felony drugs in 2005 (Thurston Co[unty][No. ]05-1-00350-6).

Prior to that, he had a 2003 (Assault 4/[domestic violence]) conviction.

There are a lot of non-felony driving offenses between 2003 and going back to 1995. Mostly [driving without a valid operator's license], then [driving with a suspended license] offenses (about a dozen during that time[)].

He has a 2001 conviction for Forgery out of Grays Harbor (01-1-00619-6); this would be an impeachable offense.

He has three convictions from 1998 for non-felony UIBC out of Aberdeen (Muni[cipal] C[ourt] [No. ]980053); this would also involve impeachable offenses.

13

Mr. Hokanson also has what I believe are felony drug convictions in 2002 (1 count), 2001 (1 count), and 1995 (1 count).

Again, I'm not too worried about the victim's impeachables, in light of other evidence in this case including your client, on video, trying to hide a BB gun after the alleged robbery attempt.

August 13, 2013 (5:40 p.m.): Hack to Thompson:

I got your formal offer and I'll try to see him tomorrow (remember Wednesdays kind[ of] suck in my world). You say there's a video of the incident -- I have not received that. Might I viddy [sic] it sometime soon?

August 13, 2013 (6:26 p.m.): Thompson to Hack:

You have what I have. I actually have not seen the video nor have we received it.

I'll contact [the Office of Public Defense] tomorrow and see if they can "express it" up to me. I'll contact you when I receive it.

August 13, 2013 (6:40 p.m.): Thompson to Kristy Jack:

I have Mr. Parmley's attorney asking for the video which is noted in the report which apparently shows Parmley tossing the BB gun in an aisle in Lowes. I'm hoping that law enforcement obtained a copy of this video, as it would be a pretty significant oversight if it was not.

Please let me know if you have a video from Lowes and, if so, how I might get a copy [as soon as possible]?

<u>Thompson's Declaration</u>

I am a Senior Deputy Prosecuting Attorney with the Thurston County Prosecuting Attorney's Office. In 2013, I prosecuted Kenneth Parmley for an incident involving an attempted robbery in Thurston County Superior Court Cause 13-1-00972-6. I originally charged Mr. Parmley with [the] highest applicable charge for the facts of the case: Attempted Robbery in the First Degree. Mr. Parmley ultimately pled [sic] guilty to an amended charge of Robbery in the Second Degree so that he would have a sentence range eligible for Thurston County Jail's [CDP]. On July 1, 2013, while I was still prosecuting Mr.

14

Parmley's case, I was contacted by Tami Edwards, a Corrections Deputy with the Thurston County Jail, and informed that Mr. Parmley had information regarding another inmate, Brian Cox, who was being prosecuted by DPA Craig Juris.

I then reached out to the Thurston County Public Defender's Office and later learned that attorney Karl Hack had been appointed to represent Mr. Parmley. Mr. Hack and I spoke about Mr. Parmley's case as well as Mr. Parmley's willingness to testify against Mr. Cox without receiving any consideration from me or my office in return.

Sometime during the month of July 2013, Mr. Hack had brought to my attention that Mr. Parmley knew the victim from their "old drug days" from (what I recall) the late 1990s-early 2000s. From his discussions with Mr. Parmley, Mr. Hack believed that the victim, Greg Hokanson, would have theft-related and other criminal history. Any theft-related convictions might result in offenses with which the victim could be "impeached" at trial if he testified. During these discussions, Mr. Hack indicated that Mr. Parmley had been clean and sober for about 5-6 years (and crime-free) before relapsing in the past year (2012-13). His client recognized that he needed substance abuse treatment.

Mr. Hack asked if I would be interested in considering a reduction to Robbery 2nd Degree, which would result in a sentence range of 6 - 12 months in jail (rather than prison, which would have been the case with the original charge of Attempted Robbery in the First Degree), and allowing Mr. Parmley to serve his sentence in the Jail's [CDP]. In order to be eligible for CDP, a defendant must be sentenced to a sentence that will cover custody status of approximately six (6) actual months in jail (excluding "good time" credit). The program is administered in three phases. Phase 1 involves approximately ten (10) weeks of intensive substance abuse treatment counseling while remaining in the jail's "general population"; Phase 2 involves approximately another ten (10) weeks of continued but less-intensive treatment while participating in the work release program. Phase 3 involves even less-intensive treatment than Phase 2, and is normally an additional six (6) weeks served while the person is on [EHM]. This program allows an individual to slowly transition into society during the slow reduction of ongoing treatment, all while subject to random urinalysis and location checks by CDP/work release corrections deputies which occur while the individual is on work release or EHM.

Both Mr. Hack and I have always agreed that CDP treatment is far superior to the outpatient treatment that an individual will receive during supervision by the Department of Corrections.

While I do not have notes as to the specific dates and conversations Mr. Hack and I had about this, I do recall the general

background information being provided after Mr. Hack had met with Mr. Parmley. I also note that my e[-]mail to DPA Juris, dated Wednesday, July 31, 2013, notes that:

"I was exploring the noted reduction to Robbery 2 with Karl after PTs [pre-trial hearings] on Monday [July 29, 2013]...."

In 2013, our [pretrial] hearings were held in the morning court sessions. This helps me remember that the Robbery 2 reduction was being discussed with Mr. Hack prior to the e[-]mails I sent out on July 29, 2013 e[-]mails after 5 p.m., referenced below.

On July 29, 2013, at 5:06 p.m. (per the e[-]mail time) I e[-]mailed Mr. Hack to advise him that I was hoping to be on vacation for the next two weeks and that I would be sending an e[-]mail to DPA Juris asking if he had interest in using Mr. Parmley's testimony in his case to contact Mr. Hack. In the e[-]mail [I] noted that I would be giving DPA Juris my "case parameters", meaning what I expected the case to be resolved at, and referencing a potential Robbery 2nd Degree conviction. I also noted in that e[-]mail that I had already begun looking into the CDP request — which would only be available if the case was resolved at Robbery 2nd Degree. I would be looking into whether CDP would accept an individual whose sentence involved a "violent" offense and when the crime would not allow for EHM — normally part of CDP's "Phase 3", as noted, because Washington law prevented him from serving a sentence for this crime on EHM. I often type send these e[-]mails for cases after [pretrial] or omnibus hearings simply to memorialize discussions about what either side may have stated it would do following the hearing. Again, this was done as part of the normal case negotiations and without any requirement or condition of Mr. Parmley's cooperation in the Cox case.

A few minutes later, in an e[-]mail I sent to DPA Juris, dated July 29, 2013, with an indicated time of 5:09 p.m., I advised him that my [pretrial] hearing was continued 2 weeks and that I'd be on vacation. I noted the parameters of what I was willing to do in Mr. Parmley's case if a consideration in my case was necessary for his (DPA Juris'[s]) case. As I noted in the e[-]mail, I was expecting to be on vacation during part of the upcoming two weeks. My purpose in e[-]mailing him was to essentially allow him to use my case, if he needed, so long as the charge was not reduced below a Robbery 2nd Degree. No offer was conveyed in exchange for Mr. Parmley's testimony.

I also have found an e[-]mail that I sent to the CDP program administrators at the time, Corrections L[ieutenant] Valerie Peters and Corrections Sergeant Teresa Becker, later that evening (July 29, 2013 at 5:11 p.m.) asking for their input as to these eligibility issues.

The following day, July 30, 2013, DPA Juris e[-]mailed me that Mr. Hack had said that Mr. Parmley would appreciate any consideration, but was very clear that he was not expecting any. I did not make an offer contingent upon Mr. Parmley's testimony against Mr. Cox.

Following the next [pretrial] hearing in Mr. Parmley's case, held on August 12, 2013, I sent an e[-]mail on August 13, 2013, in which I extended an offer to Mr. Hack for Mr. Parmley to plead guilty to an amended charge of robbery in the second degree in order to allow for his participation in the CDP program that was tentatively not conditioned upon Mr. Parmley's cooperation in the case against Cox. I indicated that I wanted DPA Juris'[s] approval prior to going forward. I confirmed that DPA Juris was fine with the resolution not being contingent upon Mr. Parmley's participation in the prosecution of Cox. Neither Mr. Parmley nor his attorney Karl Hack asked for special consideration in Parmley's prosecution in exchange for his testimony against Cox.

My main motivation for reducing Parmley's charge was based on my belief that Mr. Parmley and the community would benefit from his participation in the CDP program. I had also shared with Mr. Hack that the victim in Mr. Parmley's case had prior criminal history that would have been admissible. I was further motivated by Mr. Parmley's time in the community that he had been successful in not obtaining criminal convictions. At the time I was prosecuting him, my understanding was that he had not had a felony conviction since 2005. I truly believed that allowing Mr. Parmley to participate in the CDP program was the best outcome Mr. Parmley's case.

I have reviewed the e[-]mails that were pulled from Thurston County archives by [DPA] Joseph Jackson, between DPA Juris, Karl Hack[,] and myself, and they accurately reflect my recollection of the correspondence that occurred regarding Mr. Parmley's testimony against Mr. Cox. I have also reviewed Mr. Parmley's Statement of Defendant on Plea of Guilty, the Statement of Criminal History that I filed in conjunction with Mr. Parmley's plea of guilty and the Judgment and Sentence of Mr. Parmley[,] which DPA Jackson informs me will be Appendices 8, 9 and 10 to his response to Cox's PRP and confirmed that they are true and correct copies of the documents entered in Mr. Parmley's case.

Finally, I would note that the e[-]mails from August 13, 2013 and afterwards clearly indicate that this plea agreement was based upon my motivation to have him participate in CDP and not as consideration for Mr. Parmley cooperating with the investigation in Mr. Cox's case nor providing later testimony. It was also my intent to be transparent in what the plea agreement was based on and what it was not.

17

- In my August 13, 2013 e[-]mail (12:34 p.m.) I state:

  Secondly, I'll indicate that I am willing to give your client the "Robbery 2" based upon his lack of violent history and his request for drug treatment through CDP.

  I later indicated in the same e[-]mail:

  In any event, you have indicated that your client is willing to truthfully testify against Mr. Cox should he be needed by Craig, and that such truthful testimony would be consistent with his statement to Det[ective] Kolb and be provided without me needing to condition my case's outcome on your client's testimony. I am tentatively indicating to you that my offer of Robbery 2 will not be conditioned on your client's cooperation as a witness in the Cox case, **but I want to first ask Craig if he is "okay" with this?** If he is, it appears that we can immediately look into wrapping Mr. Parmley's case up. However, despite the information and "timing" noted above, I still believe that Craig would have to disclose to Cox's counsel at least the "arguable" influence of my case on Mr. Parmley's offered information against Mr. Cox. Therefore, I have spent time detailing the above so that Craig has this information to forward to Cox's counsel after you have either confirmed or clarified the information outlined above.

- On August 15, 2013, I exchanged e[-]mails with Mr. Hack:

  **[Mr. Hack at 12:32 PM:]** *** OK, thanks for the info! I'll go see him this p.m. You insisting on CDP then, as opposed to something like a lower sentence of straight jail time and CDP while on community custody?

  **[Mark Thompson, at 2:05 PM:]** CDP was my main motivation for deciding to drop the charge to Robbery 2. If he has no interest in that, then I have to withdraw the offer until I can come up with another satisfactory justification for the reduction. Not saying that I wouldn't come back with Robbery 2, but I'll want an **acceptable** reason to justify it.

  There is no reference to his cooperation or testimony in the Cox case being a basis for the Robbery 2nd Degree offer, and the assertion that I would withdraw the offer if he was not interested in CDP does not demonstrate any concern about any impact on Mr. Parmley's independent commitment to cooperate or testify in the Cox case.

- A series of e[-]mails exchanged between Mr. Hack and me on August 15-16, 2013, further indicate that I was ready to pull the offer when it appear[ed] that Mr. Parmley was trying to use pending warrants as an excuse for not doing CDP. Again, these e[-]mails do not demonstrate any connection with nor concern about the impact on Mr. Parmley's involvement with the Cox case.
-

(Alterations in the internal quotation are in original.)]

Juris's Declaration

On July 29, 2013, DPA Thompson sent me an e[-]mail in which he gave me authority to negotiate with Parmley's attorney Karl Hack if necessary for my case. Mr. Hack indicated that Parmley was offering to help in the prosecution of Cox for "zero consideration." With that information, I never extended an offer on Mr. Thompson's behalf. . . . I did not object when DPA Thompson offered to settle the matter without consideration.

Hack's's Declaration

Upon review of my file, there is no indication that the resolution was in any way conditioned on Parmley's testimony against Brian Cox. In fact DPA Thompson sent me e[-]mails that] made it pretty clear that the offer to Parmley was in fact not conditioned in any way on Parmley helping DPA Juris in the prosecution of Brian Cox, rather, the ultimate offer was conditioned primarily upon Parmley being eligible for the [CDP] on a conviction for robbery in the second degree.

Parmley's plea agreement stated nothing about Parmley testifying at Cox's trial.

It is unclear whether Parmley, not just his counsel, knew of the State's original offer. Thompson changed the offer between July 29 and August 13. It is unclear if Parmley knew that the State was willing to offer him a reduced charge in exchange for his truthful testimony when he communicated that he would testify without consideration. Similarly, it is unclear if the State knew Parmley was aware of its willingness to reduce his charge if he testified. Such knowledge could

19

indicate that there was an implicit agreement between the State and Parmley regarding his testimony. If there was an implicit agreement, Thompson and Parmley's testimony that Parmley received no consideration could be false.

The e-mails disclosed in the State's response to the PRP raise questions of fact about the truthfulness of the testimony of Thompson and Parmley. This court does not resolve factual questions. We remand for a reference hearing to determine whether (1) Thompson and Parmley's testimony was actually false, (2) Juris knew or should have known that Thompson and Parmley's testimony was actually false, and (3) the false testimony was material.

## II.   Impeachment Evidence

Cox argues next that, contrary to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L Ed. 2d 215 (1963), the State failed to disclose material impeachment evidence. Specifically, he asserts that the State failed to disclose evidence that Parmley had five outstanding bench warrants and that it failed to disclose e-mails evidencing consideration to Parmley for his testimony against Cox.

There are three components of a true Brady violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. Strickler v. Green, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). The suppression of evidence favorable to a criminal defendant and material to either guilt or punishment is a violation of due process, regardless of the good or bad faith of the

prosecution. Brady, 373 U.S. at 87. Favorable evidence under Brady now includes not only exculpatory evidence but also impeachment evidence. State v. Mullen, 171 Wn.2d 881, 894, 259 P.3d 158 (2011).

Under Brady, "the prosecution has an affirmative duty to learn of and disclose any impeachment evidence known to the prosecution that is material to guilt or punishment." In re Pers. Restraint of Lui, 188 Wn.2d 525, 565, 397 P.3d 90 (2017). "This duty extends to information held by others acting on the government's behalf, not just those facts within the prosecutor's file." Id.

For the third element of a Brady violation claim, the terms "material" and "prejudicial" are used interchangeably. Mullen, 171 Wn.2d at 897. Evidence is "prejudicial" or "material" if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. Id.

Cox notes that the State disclosed Parmley's prior convictions, but contends that it withheld Parmley's five outstanding warrants. He argues that, had the prosecution revealed the outstanding warrants, "[t]he defense could have presented evidence that the existence of those warrants gave Parmley a motive to testify[,] hoping [that] the [State] would assist him in quashing the warrants."

Evidence that Parmley had five outstanding warrants at the time he testified is suggestive of the fact that he had something to gain in exchange for his testimony. There is evidence that, before Parmley entered his guilty plea, Thompson and Hack discussed a warrant that had been issued for Parmley out of

21

Jefferson County. In an e-mail to Hack, Thompson offered to assist with the warrant so that Parmley could participate in CDP:

> I can certainly assist with this. If he pleads guilty here and is sentenced to CDP and is found eligible, we can request Jefferson County to do a transport order (but would help if Mr. Parmley send[s] to Jefferson County a request to clear the detainer as well, post-sentence). As soon as he's out, we can put a "hold" back on him so that he'll be returned here. I would be willing to reach out to Jefferson County and explain the situation here and, perhaps, they'll agree that any sentence that is imposed on the Failure to Transfer Title be served here and concurrently with the Thurston County case sentence.

Cox argues that this evidence could have established that Parmley had a motive for testifying—his hope that the State would quash the warrants.

Cox also argues that the warrants could have shown evidence of Parmley's dishonesty. To support this argument, Cox cites CrRLJ 2.5. Under that rule, a court may order the issuance of a bench warrant for the arrest of a defendant "who has failed to appear before the court . . . in answer to a citation and notice, or an order of the court, upon which the defendant has promised in writing to appear, or of which the defendant has been served with [or] otherwise received notice to appear." Id. Cox argues that if Parmley promised in writing to appear but then broke his promise, the outstanding warrants indicate dishonesty. But, we do not know whether Parmley made a written promise to appear.

After Thompson testified that Parmley had been able to remain crime free, Parmley testified that he had five previous convictions. Three were from 2004, one was from 2005, and the last was from 2013. Cox agrees that the State disclosed Parmley's prior convictions. He takes issue with the failure to disclose

22

the evidence of the outstanding warrants. He questions whether Parmley broke promises to appear on any of those warrants. Cox argues that "the defense could have impeached Thompson's testimony that Parmley had 'time in the community that he had been successfully able to remain crime free.'"

Finally, Cox asserts that the e-mails disclosed for the first time in the appendices to the State's response to the PRP show the extensive communications between the State and Parmley. He argues that the undisclosed e-mails call into question the State's motive for reducing the charges against Parmley and Parmley's motive to testify against Cox. He argues that these e-mails contradict assertions by Thompson and Hack that the resolution of Parmley's plea was not conditioned on Parmley's testimony against Cox. He argues that these e-mails show that Parmley had expressed hope for a better deal, contrary to Thompson's testimony. And, he argues that they show that the State believed it needed to disclose its communications with Parmley related to his testimony against Cox. He asserts that these e-mails would have provided an opportunity to impeach both Thompson and Parmley.

The Court of Appeals is not a fact finding court, and this opinion should not be construed as resolving any factual disputes in this case. Therefore, we remand to the trial court for a reference hearing. At the reference hearing, the trial court is to decide (1) whether the State failed to timely produce potential impeachment evidence that was material to the question of whether the State's witnesses, Thompson and Parmley, were being truthful in their testimony relative to Parmley's

23

participation as a witness, (2) whether any such evidence that was not disclosed would have provided defense counsel the opportunity to impeach Thompson or Parmley, and (3) if so, whether the failure to provide that evidence to Cox was prejudicial.

We remand to the trial court for a reference hearing on the perjury and impeachment issues consistent with this opinion.

Appelwick, C.J.

WE CONCUR:

Leach, J.                    Schindler, J.